# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-3519

_____

Charles McManemy

*Plaintiff - Appellant*

v.

Bruce Tierney; Kiley Winterberg; Curt Lubben; Jennifer Degroote; Karson Roose; Dewayne Viet; John/Jane Doe(s), in each individual's capacity as a law enforcement officer/jailer/dispatcher for the Butler County Sheriff's Office; Jennifer Becker, in her individual capacity as a nurse for Butler County, Iowa; Kirk Dolleslager, in his individual capacity as a law enforcement officer for the Grundy County Sheriff's Office; Sheriff Jason Johnson, in his individual capacity; Sheriff Rick Penning; Butler County; Grundy County

*Defendants - Appellees*

_____

No. 18-3520

_____

Charles McManemy

*Plaintiff - Appellee*

v.

Bruce Tierney; Kiley Winterberg; Curt Lubben

*Defendants - Appellants*

Jennifer Degroote; Karson Roose; Dewayne Viet

*Defendant*s

John/Jane Doe(s), in each individual's capacity as a law enforcement officer/jailer/dispatcher for the Butler County Sheriff's Office

*Defendant - Appellant*

Jennifer Becker, in her individual capacity as a nurse for Butler County, Iowa; Kirk Dolleslager, in his individual capacity as a law enforcement officer for the Grundy County Sheriff's Office

*Defendants*

Sheriff Jason Johnson, in his individual capacity

*Defendant - Appellant*

Sheriff Rick Penning

*Defendant*

Butler County

*Defendant - Appellant*

Grundy County

*Defendant*

_____

No. 18-3554
_____

Charles McManemy

*Plaintiff - Appellee*

v.

Bruce Tierney; Kiley Winterberg; Curt Lubben; Jennifer Degroote; Karson Roose; Dewayne Viet; John/Jane Doe(s), in each individual's capacity as a law

-2-

enforcement officer/jailer/dispatcher for the Butler County Sheriff's Office;
Jennifer Becker, in her individual capacity as a nurse for Butler County, Iowa

*Defendant*s

Kirk Dolleslager, in his individual capacity as a law enforcement officer for the
Grundy County Sheriff's Office

*Defendant - Appellant*

Sheriff Jason Johnson, in his individual capacity

*Defendant*

Sheriff Rick Penning

*Defendant - Appellant*

Butler County

*Defendant*

Grundy County

*Defendant - Appellant*
_____

Appeals from United States District Court
for the Northern District of Iowa - Ft. Dodge
_____

Submitted:  January 15, 2020
Filed: August 17, 2020

_____

Before BENTON, GRASZ, and STRAS, Circuit Judges.
_____

-3-

STRAS, Circuit Judge.

Charles McManemy believes that deputies used excessive force against him after he led them on a high-speed chase. Although he suffered physical injuries during the ensuing arrest, the district court[1] granted summary judgment to the deputies based on qualified immunity. We affirm.

I.

The deputies believed that McManemy was on his way to making a drug delivery. Hoping that they would have the chance to stop him, they seized the opportunity when he ran a stop sign. Even flashing lights and a siren, however, did not stop McManemy. For the next 10 minutes, he led them on a high-speed chase through rural highways, gravel roads, and a private farm.

With their other options exhausted, the deputies finally rammed McManemy's vehicle. McManemy eventually emerged from the disabled vehicle after trying to make a call and lighting a cigarette. When he did, he laid face down on the road with his arms and legs spread.

Still, the deputies had difficulty arresting him. Although the parties dispute how much he resisted and why, the dash-cam video shows his legs flailing, and he admits to having failed to comply with orders to "[q]uit resisting" and to "knock it off." *See* Oral Arg. at 1:44–1:50 (conceding that the dash-cam video "clearly" shows that he was resisting "up until a point"). In the end, subduing McManemy took two interlocked sets of handcuffs and six deputies.

This case is all about what happened during the scuffle. McManemy claims that one deputy tased him up to five times and that another used a knee to

[1]The Honorable Leonard T. Strand, Chief Judge, United States District Court for the Northern District of Iowa.

-4-

repeatedly bash him in the head. The blows to the head allegedly caused damage to his eye, first bruising and later problems with light sensitivity and "floaters."

McManemy brought excessive-force claims under 42 U.S.C. § 1983 against the deputies and other government defendants. Also included are claims against the other deputies on the scene, who allegedly failed to intervene and protect him. These basic theories are mirrored in several Iowa state-law claims, too.

Neither side is satisfied with how the district court decided the case. On one hand, McManemy believes that the court should not have granted summary judgment to the defendants on his federal claims. At the same time, the defendants are disappointed that the court did not exercise supplemental jurisdiction over McManemy's state-law claims. Both appeal the parts of the ruling that they lost.

II.

We review the district court's decision to grant summary judgment de novo. *Morgan v. Robinson*, 920 F.3d 521, 523 (8th Cir. 2019) (en banc). "Summary judgment [was] appropriate [if] the evidence, viewed in [the] light most favorable to [McManemy], shows no genuine issue of material fact exists and the [defendants were] entitled to judgment as a matter of law." *Phillips v. Mathews*, 547 F.3d 905, 909 (8th Cir. 2008) (citation omitted).

For McManemy's federal claims, it all comes down to whether the deputies are entitled to qualified immunity, which depends on the answer to two questions. First, did they violate a constitutional right? Second, was the right clearly established? *See Morgan*, 920 F.3d at 523. If the answer to either question is "no," we will affirm. *See id.* (making clear that we may answer the questions in either order).

-5-

## A.

The first allegedly unconstitutional act was the use of a taser against McManemy. *See Jackson v. Stair*, 944 F.3d 704, 710 (8th Cir. 2019). In addition to suing Deputy Kirk Dolleslager, who used the taser, McManemy alleges that a nearby officer, Deputy Curt Lubben, violated clearly established law by failing to intervene on his behalf. *Hicks v. Norwood*, 640 F.3d 839, 843 (8th Cir. 2011) (discussing the duty to intervene). Both claims depend on whether using the taser was objectively reasonable under the circumstances. *See Graham v. Connor*, 490 U.S. 386, 396–97 (1989); *Hicks*, 640 F.3d at 843.

### 1.

As in many qualified-immunity cases, the parties have "two different stories" about what happened. *Scott v. Harris*, 550 U.S. 372, 378, 380 (2007). McManemy claims that Deputy Dolleslager "sadistically" tased him in drive-stun mode,[2] once before handcuffing him and two-to-four times afterward. Deputy Dolleslager says that he only tased him twice, once before placing the handcuffs on his right wrist and once more to get them on his other wrist.

In an appeal from a summary-judgment ruling on qualified immunity, we typically credit the plaintiff's version of the facts. *See id.* at 378. In some cases, however, the record so "blatantly contradict[s]" the plaintiff's account that "no reasonable jury could believe it." *Id.* at 380. In those instances, we do *not* "adopt th[e plaintiff's] version of the facts" in evaluating whether the officers were entitled to summary judgment. *Id.*

---

[2]Drive-stun mode is the "lowest" setting. In this mode, the taser makes direct contact with the suspect's skin, but the charge is not incapacitating. *See Cravener v. Shuster*, 885 F.3d 1135, 1137 n.1 (8th Cir. 2018).

This is one of those cases. Many tasers have logs that record when and how they are used. The log on Deputy Dolleslager's device revealed that it had only been discharged twice—each for three seconds, fifteen seconds apart. McManemy has never challenged the log's accuracy, so the record "blatantly contradicts" his account that he was tased between three and five times. *See* Oral Arg. at 2:10–2:25 (conceding that the log accurately reflects the number and timing of the taser bursts).

With the taser having been discharged only twice, McManemy's admissions take on central importance. *See Tokar v. Armontrout*, 97 F.3d 1078, 1081–83 (8th Cir. 1996) (relying heavily on a plaintiff's admissions when affirming a qualified-immunity ruling). The first key admission is that he was not yet handcuffed when Deputy Dolleslager tased him the first time. Under our precedent, it is reasonable for an officer to tase an uncuffed suspect who appears to be resisting arrest. *See Ehlers v. City of Rapid City*, 846 F.3d 1002, 1011 (8th Cir. 2017); *Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012).

The second tasing was reasonable too because of McManemy's other admission: in the intervening 15 seconds between taser discharges, the deputies had to get the handcuffs on his other wrist. Construing the remaining disputed facts in McManemy's favor, it is possible that Deputy Dolleslager tased him for the second time just *after* he was fully handcuffed. Even so, we have already held that discharging a taser in drive-stun mode under similar circumstances is objectively reasonable. *See Brossart v. Janke*, 859 F.3d 616, 626 (8th Cir. 2017); s*ee also Franklin v. Franklin Cty.*, 956 F.3d 1060, 1062–63 (8th Cir. 2020) (discussing cases allowing the use of drive-stun taser bursts on suspects who are already handcuffed). After all, here it came at the tail end of a "tumultuous" struggle between McManemy and the deputies. *Rudley v. Little Rock Police Dep't*, 935 F.3d 651, 654 (8th Cir. 2019).

It makes no difference if, as McManemy argues, one of the deputies knew that he had a preexisting shoulder condition that made it difficult for him to comply with their commands. *See Schoettle v. Jefferson Cty.*, 788 F.3d 855, 858, 860–61 (8th Cir. 2015). Regardless of whether one or more of them knew about his injury, the deputies still had to subdue him, even if he had an "innocent" reason for flailing his legs and refusing to give up one of his arms. *Carpenter*, 686 F.3d at 650 (explaining that the use of a taser does not become excessive just because an arrestee has an "innocent" motive for refusing to give up his hands); *see also Schoettle*, 788 F.3d at 858, 860–61 (holding that the force used to restrain a noncompliant arrestee was reasonable even if the officers knew that his belligerence was caused by a hypoglycemic episode).

2.

This conclusion also resolves the failure-to-intervene claim against Deputy Lubben. To be sure, "an officer who fails to intervene to prevent the *unconstitutional* use of *excessive* force by another officer may be held liable for violating the Fourth Amendment." *Hollingsworth v. City of St. Ann*, 800 F.3d 985, 991 (8th Cir. 2015) (emphases added and citation omitted). But there is no duty to prevent the *constitutional* use of *reasonable* force. *See id.* If Deputy Dolleslager did not violate McManemy's constitutional rights, then neither did Deputy Lubben. *See Hicks*, 640 F.3d at 843.

B.

According to McManemy, the deputies did more than just tase him. One of them, Deputy Bruce Tierney, used his knee as a weapon and repeatedly hit him in the head with it. Once again, the claim is excessive force, but this time it fails for a different reason: the absence of a clearly established right.

1.

As with McManemy's other claim, we must first identify the relevant facts. Again, the stories differ. McManemy says that he suffered severe bruising and lasting eye damage from being hit in the face with Deputy Tierney's knee. The deputies argue, by contrast, that no one's knee touched McManemy's head and that his injuries must have happened some other way. They claim to have proof: a dash-cam video.

The dash-cam video, however, is equivocal at best. It shows Deputy Tierney kneeling next to McManemy's head for about 40 seconds. But for much of that time, it is impossible to see what he is doing because another officer and a dog block the view. And even when they do not, the footage is just too grainy to make out what is happening. In short, the video does not "blatantly contradict[]" McManemy's account. *Coker v. Ark. State Police*, 734 F.3d 838, 841, 843 (8th Cir. 2013) (citation omitted) (reaching a similar conclusion when faced with an inconclusive dash-cam video).

Construing the facts in McManemy's favor, Deputy Tierney still did not violate a clearly established right. McManemy does not suggest that this is the "rare[,] obvious case," in which the violation is so clear that it is unnecessary to identify an "existing precedent." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (internal quotation marks and citation omitted). So to prevail on this claim, McManemy must point to a case that "squarely governs the specific facts at issue." *Kelsay v. Ernst*, 933 F.3d 975, 980 (8th Cir. 2019) (en banc) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam)). He believes there are two: *Gill v. Maciejewski*, 546 F.3d 557 (8th Cir. 2008), and *Krout v. Goemmer*, 583 F.3d 557 (8th Cir. 2009). Neither, however, "squarely governs" this case.

The first, *Gill*, is the closer of the pair. There too, an officer slammed his knee into an arrestee's head. 546 F.3d at 561. The arrestee, who was lying on the

-9-

ground at the time, suffered five facial-bone fractures, a concussion, and a brain bleed after the officer performed a standing knee-drop maneuver on him. *Id.* We upheld the jury's finding that this level of force was unreasonable under the circumstances. *Id.* at 562.

For two reasons, however, *Gill* is still not close enough. First, Gill offered "no resistance," whereas McManemy led deputies on a 10-minute, high-speed chase and, by his own admission, put up some resistance once he was captured. *Id.* at 561–62; *see Kelsay*, 933 F.3d at 980 (distinguishing between fully compliant and non-compliant arrestees); *see also Kisela*, 138 S. Ct. at 1152 (discussing flight). Second, the level of force was different. By jumping on Gill from a standing position, the officer used near-deadly force and caused life-threatening injuries. *Gill*, 546 F.3d at 561. Although what happened here was violent, it is not in the same league as the knee-drop maneuver from *Gill*. *See Mann v. Yarnell*, 497 F.3d 822, 826 (8th Cir. 2007) (explaining that we consider the injuries suffered when evaluating the level of force).

The second, *Krout*, is not even close. It involved extreme levels of "gratuitous" force against a "fully[-]subdued," non-resisting arrestee who eventually died. 583 F.3d at 563, 566. An officer "hip toss[ed]" him to the ground, and then, together with other officers, beat him. *Id.* at 561. The use of force in this case, by contrast, falls well short of *Krout*. And perhaps most importantly, McManemy admits that he suffered his injuries during a struggle to handcuff him, not when he was "fully subdued." *Id.* at 566; *see Kelsay*, 933 F.3d at 980 (drawing a similar distinction).

2.

This analysis extends to the other deputies, too. To hold them liable for their failure to intervene, McManemy had to establish that they knew "or had reason to know that excessive force would be or was being used." *Hollingsworth*, 800 F.3d

-10-

at 991 (citation omitted). If Deputy Tierney did not violate a clearly established right, then the other deputies would not have had "fair notice" that he was using *unconstitutionally* excessive force against McManemy either. *Id.*

## III.

One loose end remains. The district court declined to exercise supplemental jurisdiction over McManemy's Iowa state-law claims after it had "dismissed all [the] claims over which it ha[d] original jurisdiction." 28 U.S.C. § 1367(c)(3). The defendants wanted the court to decide those on the merits too, rather than just dismissing them without prejudice.

We rarely overturn this "purely discretionary" call. *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 359 (8th Cir. 2011) (citation omitted) (reviewing for an abuse of discretion). In fact, when a district court has dismissed every federal claim, as here, "judicial economy, convenience, fairness, and comity" will usually "point toward declining to exercise jurisdiction over the remaining state-law claims." *Wilson v. Miller*, 821 F.3d 963, 970–71 (8th Cir. 2016) (citation omitted). This case is no exception. *See, e.g.*, *Zubrod v. Hoch*, 907 F.3d 568, 572–73, 580–81 (8th Cir. 2018) (affirming in a similar case).

## IV.

We accordingly affirm the judgment of the district court.

GRASZ, Circuit Judge, concurring in part and dissenting in part.

"It [is] clearly established . . . that when a person is subdued and restrained with handcuffs, a 'gratuitous and completely unnecessary act of violence' is unreasonable and violates the Fourth Amendment." *Blazek v. City of Iowa City*, 761 F.3d 920, 925 (8th Cir. 2014) (quoting *Henderson v. Munn*, 439 F.3d 497, 503

-11-

(8th Cir. 2006)).  Viewed in a light most favorable to McManemy, the facts establish Deputy Tierney repeatedly — twenty to thirty times — kneed McManemy in the eye area *after* he was subdued and restrained.  Therefore, I do not believe Tierney is entitled to qualified immunity for this gratuitous use of force and I dissent from Section II.B. of the court's opinion.

When defining the context surrounding the challenged use of force for purposes of either prong of the qualified immunity analysis, we are required to grant inferences in favor of the non-moving party. *See Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014).  Failure to do so results in the impermissible invasion into the province of the fact-finder by weighing the evidence. *Id.* at 657.

Here, I believe the context surrounding Tierney's use of force is particularly important.  McManemy led police officers on a long, high-speed chase. This put both the participants and the public at risk.  But ultimately he laid facedown in the middle of the road with his arms and legs spread, giving himself up for arrest.  According to McManemy, the resulting melee occurred because the officers incorrectly thought he was resisting arrest when they tried to handcuff him, when in fact a preexisting shoulder injury and an involuntary response to tasing caused the appearance of resistance.  Regardless of the reason for the struggle, I agree with the court it was reasonable for the officers to believe otherwise and this justifies some of the physical force used.

But I do not believe Tierney's repeated kneeing of McManemy in the eye was within that justified use of force.  The video evidence presented showed Tierney arrived at the scene after McManemy had laid down and after at least four officers were already on top of him.  Tierney arrived, first kicked or stomped on McManemy's leg, and then moved to the left side of McManemy's head.  As the court explains, the video does not show what Tierney then does for the next minute or so.  But if we are to believe McManemy, Tierney repeatedly — up to twenty or thirty times — kneed him, resulting in demonstrable injury to the eye.

The court distinguished what happened to McManemy from cases like *Gill v. Maciejewski*, 546 F.3d 557 (8th Cir. 2008), and *Krout v. Goemmer*, 583 F.3d 557 (8th Cir. 2009), by noting that the plaintiffs in those cases were subdued and offered no resistence. But in light of the above-mentioned evidence and our duty to draw inferences in McManemy's favor, a jury could conclude that some of the strikes from Tierney's knee occurred after McManemy was handcuffed and after any reasonable belief in resistance would cease. That is, a jury could find that Tierney struck McManemy's face when he was subdued and offered no resistence. If true, such actions were completely unnecessary to effect the arrest. This circuit has clearly established that gratuitous force after a subdued suspect no longer poses a threat violates the Fourth Amendment. *See Blazek*, 761 F.3d at 925 (holding that jerking a non-resisting suspect from the floor to his bed after he was handcuffed and posed no threat violated clearly established law); *Krout*, 583 F.3d at 566 ("It was clearly established that the use of this type of gratuitous force against a suspect who is handcuffed, not resisting, and fully subdued is objectively unreasonable under the Fourth Amendment."); *Gill*, 546 F.3d at 562 (explaining an officer used excessive force where he smashed his knee into a suspect's head when the suspect was not resisting and was already pinned down by multiple officers). Thus, I believe there is sufficient evidence of a clearly established Fourth Amendment violation and would reverse the district court's grant of summary judgment in favor of Tierney.

_____